# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
### EASTERN DIVISION

Chubb Custom Insurance Company,

      Plaintiff,

-v-                              Case No.  2:07-cv-1285
                                           JUDGE SMITH
                                           Magistrate Judge King

Grange Mutual Casualty Company, *et al.*,

      Defendants.

## OPINION AND ORDER

This matter is before the Court on the Motion for Summary Judgment filed by Plaintiff Chubb Custom Insurance Company ("Chubb") (Doc. 68), and the Motion for Partial Summary Judgment filed by Defendants Grange Mutual Casualty Company, *et al.* (collectively "Grange" or "Defendants") (Doc. 69).  These motions are fully briefed and ripe for review.  For the reasons that follow, the Court **DENIES in part** Chubb's Motion for Summary Judgment, **GRANTS** Grange's Motion for Partial Summary Judgment, and **DEFERS** ruling on Chubb's Motion for Summary Judgment as it relates to Grange's bad faith counterclaim.

## I.  BACKGROUND

This case involves an insurance coverage dispute between Chubb and Defendants (Grange).  Chubb and Defendants are all insurance companies, and each of the Defendants is a named insured under an Insurance Company Professional Liability Policy that Chubb issued for the Policy Period July 1, 2004, to July 1, 2005 (the "Policy").  Under the Policy, Chubb generally

agreed to indemnify these Defendants (Grange) for losses arising from Grange's performance of claims handling and adjusting (the specifics of this agreement will be detailed below).

The parties dispute whether the Policy provides coverage for Grange in connection with two class action lawsuits initiated in Arkansas against Grange by its own insureds.  The first class action, styled *Hensley, et al. v. Computer Sciences Corp., et al.* (the "Hensley Action"), was brought against Grange in 2005, and other insurance companies, generally alleging that these insurers had improperly used certain computer software in connection with the processing of claims.  Grange was dismissed without prejudice from this lawsuit in December 2007.  Shortly before the dismissal of the Hensley Action, the second class action lawsuit, styled *Gooding et al. v. Grange Indemnity Insurance Co. et al.* (the "Gooding Action"), was filed against Grange, and no other defendants.  Shortly thereafter, the Gooding Action was settled pursuant to a "Stipulation of Settlement" submitted to the Arkansas court.  Chubb received a copy of the Stipulation of Settlement, and Grange sought indemnification for payments made in connection with the Stipulation of Settlement in the Gooding Action and reimbursement for defense costs incurred in the Hensley Action and/or the Gooding Action.

A few days later, Chubb initiated this action seeking declaratory relief.  Chubb seeks declaratory judgment that the Hensley Action, the Gooding Action, and the Stipulation of Settlement are not covered under the Policy (Count I); that there is no "Loss" under the Policy and therefore no coverage (Count II); that it has no duty to indemnify Grange because the "benefits due exclusion" applies (Count III); and that its advancement of defense costs to Grange was reasonable and proper and should be reimbursed (Count IV).  Grange filed an answer and a Counterclaim alleging claims of breach of contract (Count I), indemnification (Count II), and

estoppel (Count IV), in connection with its request for coverage relating to the Hensley Action, the Gooding Action and/or the Stipulation of Settlement in the Gooding Action.  Additionally, Grange asserts a counterclaim for bad faith (Count III) and seeks an award of punitive damages in connection with this counterclaim.

On February 15, 2011, both parties moved for summary judgment.  Chubb moves for summary judgment on all claims.  Grange requests the granting of summary judgment in its favor as to Counts I, II, and III of Chubb's Complaint, the granting of partial summary judgment as to Count IV of Chubb's Complaint, and the granting of summary judgment as to Count II of its Counterclaim.  These motions are fully briefed and ripe for disposition.

## II.    THE POLICY

The Policy provides that Grange is "covered" under "Insuring Clause 1".  Pursuant to "Insuring Clause 1" of the Policy, and "in consideration of payment of the premium and subject to the Declarations, limitations, conditions, provisions and other terms of [the] Policy," Chubb agreed:

> To pay on behalf of the **Insureds** for **Loss** which the **Insureds** shall become legally obligated to pay as a result of any **Claim** first made against the **Insureds** during the **Policy Period** or, if elected, the Extended Reporting Period, arising out of any **Wrongful Act** committed by the **Insureds** or any person for whose acts the **Insureds** are legally liable during or prior to the **Policy Period** while performing **Insurance Services** including the alleged failure to perform **Insurance Services**.

(Bold terms are presented as in the original and represent defined terms in the Policy) (Doc. 2-1).

Section 26 of the Policy defines "Wrongful Act" as follows:

> **Wrongful Act** means any error, misstatement, misleading statement, act, omission, neglect or breach of duty committed, attempted, or allegedly committed or attempted, by the **Insureds** or any person for whose acts the **Insureds** are legally liable, which arises solely from the **Insureds** or any person for whose acts the

3

**Insureds** are legally liable, performing **Insurance Services** or **Financial Services** including alleged failure to perform **Insurance Services** or **Financial Services**.

*Id.*

Section 26 of the Policy, as amended by Endorsement No. 11, defines "Insurance Services" in part as follows:

**Insurance Services** means only those services rendered or required to be rendered by or on behalf of the **Insureds** solely in the conduct of the **Insureds'** claims handling and adjusting; insurance risk management; insurance pool management; safety engineering, inspection and loss control operations; personal injury rehabilitation operations; salvage operations; recovery subrogation services; premium financing operations; actuarial consulting services; credit and investigatory services; insurance agency and brokerage operations; policy recission/cancellation; reinsurance intermediary; underwriting manager; program administer; insurance consultant; notary public; or managing general agent[.]

*Id.*

Section 26 of the Policy, as amended by Endorsement No. 3 to the Policy, defines "Loss" as follows:

**Loss** means the total amount which the **Insured** becomes legally obligated to pay as a result of each **Claim** or **Claims** in each **Policy Period** and the Extended Reporting Period, if exercised, made against the **Insureds** for **Wrongful Acts** for which coverage applies, including, but not limited to, damages, judgments, settlements, costs and **Defense Costs**.

**Loss** does not include:

a.      regular or overtime wages, salaries or fees of the directors, officers or employees of the **Insured Organization**;

b.      loss of the actual money, securities, property or other items of value in the custody or control of the **Insureds**; or diminution in value or damages resulting from the diminution in value of money, securities, property or any other item of value unless caused by a **Wrongful Act** of the **Insureds** in the execution or implementation of investment advice or investment decisions;

4

  c.  fines or penalties imposed by law, including, but not limited to, punitive or exemplary damages; or the multiplied portion of any multiplied damage award; or any other matters or sanctions which may be deemed uninsurable under the law pursuant to which this Policy shall be interpreted;

  d.  any amounts which constitute premiums; fees and charges; return or refund of premiums; commissions or taxes; or loss arising out of any commingling of funds; or

  e.  principal, interest, or other moneys either paid, accrued or due as the result of any loan, lease or extension of credit.

*Id.*

Section 4 of the Policy sets forth exclusions applicable to "Insuring Clause 1." One of these exclusions is the following (which is referred to by the parties as the "benefits due exclusion"):

for any amounts which constitute benefits, coverage or amounts due or allegedly due, including any amount which constitutes interest thereon, from the **Insureds** as:

  i.  an insurer or reinsurer under any policy or contract or treaty of insurance, reinsurance, suretyship, annuity or endowment; or

  ii.  an administrator under any employee welfare benefit plan[.]

*Id.*

Regarding "Defense and Settlement," Section 7 of the Policy provides as follows:

Subject to this Section, it shall be the duty of the **Insureds** and not the duty of [Chubb] to defend **Claims** made against the **Insureds**.

The **Insured** shall have the sole obligation under this Policy to retain defense counsel, which shall be subject to the approval of [Chubb].

The **Insured** agrees not to settle any **Claim**, incur any **Defense Costs** or otherwise assume any contractual obligation or admit any liability with respect to any **Claim** without [Chubb's] written consent, which shall not be unreasonably withheld.

5

[Chubb] shall not be liable for any settlement, **Defense Costs**, assumed obligation or admission of liability to which it has not consented.

[Chubb] shall have the right and shall be given the opportunity to effectively associate with the **Insureds** in the investigation, defense and settlement, including but not limited to the negotiation of a settlement, of any **Claim** that appears reasonably likely to be covered in whole or in part by this Policy.

The **Insureds** agree to provide [Chubb] with all information, assistance and cooperation which [Chubb] reasonably requests and agree that, in the event of a **Claim**, the **Insureds** will do nothing that may prejudice [Chubb's] position or its potential or actual rights of recovery.

**Defense Costs** are part of and not in addition to the Limits of Liability set forth in ITEM 2. of the Declarations for this Policy, and the payment by [Chubb] of **Defense Costs** reduces such Limits of Liability.

*Id.*

Section 26 of the Policy defines **Defense Costs** as follows:

**Defense Costs** means that part of **Loss** consisting of reasonable costs, charges, fees (including but not limited to attorneys' fees and experts' fees) and expenses (other than regular or overtime wages, salaries or fees of the directors, officers of employees of the **Insured Organization**) incurred in defending or investigating **Claims** and the premium for appeal, attachment or similar bonds.

*Id.*

## III.    THE UNDERLYING ACTIONS AGAINST GRANGE

In 1998, Grange began efforts to increase profits by reducing "loss leakage," which is a term used to characterize claim settlements that are in excess of a fair and reasonable amount. That is, Grange wanted to reduce, in its view, overpayments that were in excess of fair and reasonable amounts.  By reducing these payments, Grange's profits could increase.  In support of this effort, Grange entered into a licensing contract with a software company enabling it to use the company's proprietary claims handling software.  The basic function of the software was to

6

provide Grange's adjusters a numerical range within which to settle each general damage bodily injury claim.  Grange's management prohibited the disclosure of the use of this software to insureds, which was consistent with its confidentiality agreement with the software provider.

As discussed above, two class action lawsuits were filed against Grange by its insureds alleging improper use of software in the claims process.  The first lawsuit, the Hensley Action, involved hundreds of insurers and extensive discovery.  Chubb advanced over $1.8 million to Grange for defense costs in the Hensley Action, and it also reserved the right to seek reimbursement for these defense costs.  The Hensley plaintiffs alleged in part that, through the use of the software, Grange and the other insurers, "systematically and uniformly pay insured persons less for their bodily injury claims than they would be legally entitled to recover as damages from the owner or operator of an uninsured or underinsured vehicle. . . . As a result of the [insurers'] deceptive actions related to the use of [the software] . . . the [plaintiffs] were damaged because they received payments from the [insurers] that were less than they were legally entitled to recover as damages from the owners or operators of an uninsured or underinsured motor vehicle."  (Doc. 2-4, p. 26).  Thus, the gravamen of the Hensley Action was that Grange and other insurers were improperly using software to evaluate and underpay what their insureds were entitled to recover as general damages for bodily injury sustained due to the conduct of an operator of an uninsured or underinsured motor vehicle.

Grange was ultimately dismissed without prejudice from the Hensley Action apparently in order to facilitate settlement between Grange and the plaintiffs in the second class action, the Gooding Action.  The gravamen of the Gooding Action was virtually the same as in the Hensley

7

Action, but the claims of the class were only against Grange.  The parties in the Gooding Action entered the Stipulation of Settlement shortly after that case was initiated.

The Stipulation of Settlement defined the "**SETTLEMENT CLASS**" as "[e]ach and every person who, during the **CLASS PERIOD**: (a) was insured under an automobile insurance policy that was issue by **GRANGE**; and (b) submitted a **BODILY INJURY CLAIM**[.]" (Bold and all caps terms are presented as in the original and are defined terms in the Stipulation of Settlement) (Doc. 71-5, ¶ 36).  Excluded from the settlement class were: (1) any person whose bodily injury claim, during the class period, was resolved by litigation or arbitration in a proceeding in which the value of the bodily injury claim was determined; (2) any person who had a pending bodily injury claim; (3) any person who had already received payments equal to or greater than the applicable policy limits for the bodily injury claim; and (4) any person having a specified connection with Grange, counsel, or the government, as well as persons electing to be excluded from the class.  *Id.*  Section I of the Stipulation of Settlement defines "bodily injury claim" as follows:

> "**BODILY INJURY CLAIM**" means a claim for loss from bodily injury or injuries paid by **GRANGE** during the **CLASS PERIOD** to an **INSURED PERSON** under the **UM/UIM** provisions of a policy of private passenger automobile insurance issued by **GRANGE**, in connection with which [the software] was used in evaluating the amount of bodily injury damages.

(Doc. 71-5, ¶ 3).

The "payments to class members" provision of the Stipulation of Settlement provides that the "**ELIGIBLE CLASS MEMBERS** will receive supplemental cash payments for **GENERAL DAMAGES** from **GRANGE** under the **FINAL SETTLEMENT**."  Section I of the Stipulation of Settlement defines "general damages" as follows:

"**GENERAL DAMAGES**" means that amount of money representing only those specific elements of bodily injury damages (including but not limited to, pain and suffering, permanent impairment, disability, and loss of enjoyment of life which were estimated using [the software] and paid as part of an **INSURED PERSON'S** individual **BODILY INJURY CLAIM**, as determined by the books and records of **GRANGE**, and does not include disgorgement, punitive, restitution or similar damages.

(Doc. 71-5, ¶ 20).  The amounts paid to "eligible class members" was calculated as follows:

Each **ELIGIBLE CLASS MEMBER** will be paid a cash payment reflecting a 13% differential (as described below) in the amount of **GENERAL DAMAGES** previously paid for such **BODILY INJURY CLAIM**; provided, however, that the total of (i) the amount previously paid for such **BODILY INJURY CLAIM**, and (ii) the additional amount paid pursuant to this paragraph 59 shall not exceed the policy limit applicable to that **BODILY INJURY CLAIM**.  The cash payment to **ELIGIBLE CLASS MEMBERS** will be calculated as follows:  the **GENERAL DAMAGES** previously paid to the **ELIGIBLE CLASS MEMBERS** will be divided by .87, with the result of that calculation being decreased by the **GENERAL DAMAGES** previously paid by **GRANGE**.  For example, if the prior total **UM/UIM** payment by **GRANGE** was $10,000, and the **GENERAL DAMAGES** portion of that payment was $7,000, then the cash payment would be $7,000/.87=$8045.98-$7,000=$1,045.98.

(Doc. 71-5, ¶ 59).  Regarding the "13% differential," the Stipulation of Settlement provides as

follows:

**GRANGE**, **PLAINTIFF**, and the **SETTLEMENT CLASS** have agreed for purposes of this **SETTLEMENT** to use 13% as a negotiated method to estimate **GRANGE'S** average savings from use of [the software] on bodily injury claims during the **CLASS PERIOD**.  Given the defenses presented and the inherent risk to all from litigation, **GRANGE**, **PLAINTIFF**, and the **SETTLEMENT CLASS** agree that this method is reasonable and appropriate.

(Doc. 71-5, ¶ 103).

The Stipulation of Settlement provides that the total amount of payments available to the

class members would not exceed $5,473,248.  Grange agreed to pay class counsel's attorneys'

fees and expenses in an amount not to exceed $3,160,801.

9

## IV.    SUMMARY JUDGMENT STANDARD

The standard governing summary judgment is set forth in Rule 56 of the Federal Rules of Civil Procedure, which provides that "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Under Rule 56, "[a] party may move for summary judgment, identifying each claim or defense--or the part of each claim or defense--on which summary judgment is sought."  Therefore, a party may move for "partial summary judgment" as a means to resolve only certain claims or defenses.

Summary judgment will not lie if the dispute about a material fact is genuine; "that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  Summary judgment is appropriate, however, if the nonmoving party fails to make a showing sufficient to establish the existence of an element essential to that party's case and on which that party will bear the burden of proof at trial. *See Muncie Power Prods., Inc. v. United Techs. Auto., Inc.,* 328 F.3d 870, 873 (6th Cir. 2003) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)); *see also Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 588 (1986).

When reviewing a summary judgment motion, the Court must view all the facts, evidence and any inferences that may permissibly be drawn from the facts, in favor of the nonmoving party. *Matsushita*, 475 U.S. at 587.  The Court will ultimately determine whether "the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Liberty Lobby*, 477 U.S. at 251-53.  Moreover, the purpose of the procedure is not to resolve factual issues, but to determine if there are genuine

issues of fact to be tried. *Lashlee v. Sumner*, 570 F.2d 107, 111 (6th Cir. 1978). The Court's duty is to determine only whether sufficient evidence has been presented to make the issue of fact a proper question for the jury; it does not weigh the evidence, judge the credibility of witnesses, or determine the truth of the matter. *Liberty Lobby*, 477 U.S. at 249; *Weaver v. Shadoan*, 340 F.3d 398, 405 (6th Cir. 2003).

In responding to a summary judgment motion, the nonmoving party "cannot rely on the hope that the trier of fact will disbelieve the movant's denial of a disputed fact, but must 'present affirmative evidence in order to defeat a properly supported motion for summary judgment.'" *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479 (6th Cir. 1989) (*quoting Liberty Lobby*, 477 U.S. at 257). The existence of a mere scintilla of evidence in support of the opposing party's position is insufficient; there must be evidence on which the jury could reasonably find for the opposing party. *Liberty Lobby*, 477 U.S. at 252. The nonmoving party must present "significant probative evidence" to demonstrate that "there is [more than] some metaphysical doubt as to the material facts." *Moore v. Phillip Morris Companies, Inc.*, 8 F.3d 335, 340 (6th Cir. 1993). The Court may, however, enter summary judgment if it concludes that a fair-minded jury could not return a verdict in favor of the nonmoving party based on the presented evidence. *Liberty Lobby*, 477 U.S. at 251-52; *see also Lansing Dairy, Inc. v. Espy*, 39 F.3d 1339, 1347 (6th Cir. 1994).

Moreover, "[t]he trial court no longer has a duty to search the entire record to establish that it is bereft of a genuine issue of material fact." *Street*, 886 F.2d at 1479-80. That is, the nonmoving party has an affirmative duty to direct the court's attention to those specific portions of the record upon which it seeks to rely to create a genuine issue of material fact. *In re Morris*, 260 F.3d 654, 665 (6th Cir. 2001).

## V.     POLICY CONSTRUCTION

For the purpose of their respective summary judgment motions, the parties do not dispute that Ohio law governs the construction or interpretation of the Policy.  An insurance policy is a contract between the insurer and the insured.  *Pilkington N. Am., Inc. v. Travelers Cas. & Sur. Co.*, 861 N.E.2d 121, 125 (Ohio 2006).  And under Ohio law, "[t]he construction of written contracts . . . is a matter of law."  *Alexander v. Buckeye Pipe Line Co.*, 374 N.E.2d 146, paragraph one of the syllabus (Ohio 1978).  When a court is confronted with an issue of contractual interpretation, the court must give effect to the intent of the parties to the agreement.  *Westfield Ins. Co. v. Galatis*, 797 N.E.2d 1256, 1261 (Ohio 2003).  The court must examine an insurance contract as a whole and presume that the intent of the parties is reflected in the language used in the policy.  *Cincinnati Ins. Co. v. CPS Holdings, Inc.*, 875 N.E.2d 31, 34 (Ohio 2007) (citing *Kelly v. Med. Life Ins. Co.*, 509 N.E.2d 411, paragraph one of the syllabus (Ohio 1987)).

Contract terms are to be given their plain and ordinary meaning.  *Gomolka v. State Auto. Mut. Ins. Co.*, 436 N.E.2d 1347, 1348 (Ohio 1982); *Alexander*, 374 N.E.2d at paragraph two of the syllabus ("Common words appearing in a written instrument will be given their ordinary meaning unless manifest absurdity results, or unless some other meaning is clearly evidenced from the face or overall contents of the instrument.").  Technical terms will be given their technical meaning, unless a different intention is clearly expressed.  *Foster Wheeler Enviresponse, Inc. v. Franklin County Convention Facilities Auth.*, 678 N.E.2d 519, 526 (Ohio 1997).

"A court will resort to extrinsic evidence in its effort to give effect to the parties' intentions only where the language is unclear or ambiguous, or where the circumstances

12

surrounding the agreement invest the language of the contract with a special meaning." *Kelly*,

509 N.E.2d at 413; *see Galatis*, 797 N.E.2d at 1261 (noting that it is well-settled Ohio law that

when the language of a written contract is clear, an Ohio court may look no further than the

writing itself to find the intent of the parties).  An ambiguous provision in an insurance policy is

one that has more than one reasonable interpretation. *Hacker v. Dickman*, 661 N.E.2d 1005,

1006 (Ohio 1996).  But a provision is not ambiguous solely because it could have been more

clearly drafted. *Milburn v. Allstate Ins. Co. Prop. & Cas.*, 2009 WL 3320557 (Ohio App. 10th

Dist. Oct. 15, 2009) (citing *Rucker v. Davis*, 2003 WL 21404511 (Ohio App. 4th Dist. June 17,

2003)).  "As a matter of law, a contract is unambiguous if it can be given a definite legal

meaning." *Galatis*, 797 N.E.2d at 1261 (citing *Gulf Ins. Co. v. Burns Motors, Inc.*, 22 S.W.3d

417, 423 (Tex. 2000)).

Furthermore, "[w]here exceptions, qualifications or exemptions are introduced into an

insurance contract, a general presumption arises to the effect that that which is not clearly

excluded from the operation of such contract is included in the operation thereof." *Home

Indemn. Co. of New York v. Plymouth*, 64 N.E.2d 248, paragraph two of the syllabus (Ohio

1945).  Accordingly, in order for an insurer to defeat coverage through a clause in the insurance

contract, it must demonstrate that the clause in the policy is capable of the construction it seeks to

give it, and that such construction is the only one that can be fairly placed upon the language.

*Andersen v. Highland House Co.*, 757 N.E.2d 329, 332 (Ohio 2001).  "The insurer, being the one

who selects the language in the contract, must be specific in its use; an exclusion from liability

must be clear and exact in order to be given effect." *Lane v. Grange Mut. Cos.*, 543 N.E.2d 488,

490 (Ohio 1989).

# VI.  DISCUSSION

The parties' motions for summary judgment center on whether Grange is entitled to indemnification for payments made or expenses incurred in connection with the Hensley and Gooding lawsuits.  Because the cross-motions for summary judgment address the same or similar issues, the Court will address them together.  The Court will begin its analysis by setting forth the general arguments of the parties.

Chubb argues that it is entitled to summary judgment in its favor for three separate reasons.  First, Chubb argues that it has no obligation under the Policy to provide coverage in connection with the Hensley or Gooding lawsuit, including the corresponding Stipulation of Settlement filed in the Gooding Action, because the facts establish that neither of these lawsuits are within the scope of the Policy's "Insuring Clause 1".  Second, Chubb argues that there is no coverage in connection with the Hensley and Gooding lawsuits because there has been no "Loss" as that term is defined and construed in the Policy and at law.  Third, Chubb contends that there is no coverage in connection with the Hensley and Gooding lawsuits because the Policy's benefits due exclusion applies.  Chubb further argues that, because it had no duty to defend Grange in connection with the Hensley or Gooding lawsuits, it is entitled to reimbursement for the funds it advanced to Grange for defense costs.  Lastly, Chubb asserts that if the Court determines that there is no coverage under the Policy, Grange's bad faith counterclaim should be dismissed as a matter of law.

Grange argues that there is coverage under the Insuring Clause 1 because the facts establish the requirements of this provision.  Next, Grange argues that there has been a "Loss" as that term is defined in the Policy, and no public policy doctrine applies to preclude coverage on

14

this basis. Grange additionally argues that the benefits due exclusion does not apply. Lastly, Grange argues that, even if this Court determines that there is no coverage under the Policy, it should be permitted to retain the advanced costs under Chubb's separate and distinct duty to defend, and its bad faith claim should not be dismissed.

Based on the arguments of the parties, it is clear that there are three central issues for the Court to resolve. First, the Court must resolve whether Grange's expenses incurred and payments made relating to the Hensley and Gooding lawsuits arose out of any "wrongful act" committed by Grange "while performing insurance services," and therefore are covered under the Policy's Insuring Clause 1. Second, the Court must resolve whether Grange incurred a "loss" as that term is defined for the purpose of the Insuring Clause 1. Third, the Court must resolve whether the Policy's benefits due exclusion applies so as to preclude coverage under the Policy. To the extent necessary, the Court will address issues relating to Grange's defense costs and the bad faith claim. The Court will address these issues in turn.

### A. Coverage under Insuring Clause 1 of the Policy based on Grange's "Wrongful Act"

The Policy provides under Insuring Clause 1 that Chubb agreed to cover Grange for "Loss" which Grange is legally obligated to pay as a result of any claim made against Grange "arising out of any **Wrongful Act** committed by" Grange "while performing **Insurance Services**[.]" For there to be coverage under this provision, Grange must show that there is a claim against it arising out of any "wrongful act" committed by Grange "while performing insurance services." It is not disputed that the Hensley and/or Gooding Actions constitute a "claim" under this provision. Chubb argues, however, that the wrongful conduct that was at issue in the

15

Hensley and Gooding Actions occurred before "insurance services" were performed, and therefore it did not occur "while performing insurance services."  In support of this argument, Chubb characterizes Grange management decisions relating to the implementation of the software as "intentional business practices" that occurred before the software was used in the claims adjusting process.  (Doc. 71, p. 29).  Also, Chubb, citing cases involving "all-risk" property policies or coverage disputes relating to breaches of contracts, such as *Univ. of Cincinnati v. Arkwright Mut. Ins. Co.*, 51 F.3d 1277 (6th Cir. 1995) and *Newman v. XL Specialty Ins. Co.*, Case No. C-1-06-781, 2007 WL 2982751 (S.D. Ohio Sept. 24, 2007), argues that Grange engaged in "morally hazardous" business behavior in deciding to implement the software, and therefore should be precluded from coverage for non-fortuitous losses due to deliberate business plans.  Chubb's arguments are not persuasive.

The Policy defines "wrongful act" to mean "any error, misstatement, misleading statement, act, omission, neglect or breach of duty committed, attempted, or allegedly committed or attempted" by Grange "which arises solely from" Grange "performing insurance services."  The definition of insurance services includes "claims handling and adjusting."  According to Chubb, the alleged wrongful conduct committed by Grange did not arise "solely" from Grange performing insurance services.  Chubb essentially reasons that the wrongful conduct alleged in the Hensley and Gooding Actions did not arise solely from Grange performing insurance services because Grange made its decision to purchase and implement the software before it used the software, and because Grange entered a confidentiality agreement with the software provider before it was used. But the gravamen of the lawsuits against Grange was that it improperly used the software in order to underpay the plaintiffs for general damages on bodily injury claims.  The alleged wrongful

conduct that proximately impacted the plaintiffs was the use of the software in the adjusting of their claims, not the business decision to purchase the software. That the determination by Grange to implement the use of the software predated its use, does not place the alleged wrongful conduct beyond the scope of the Policy.

And Chubb's reliance on *Arkwright* and cases involving breach of contract policy coverage disputes is misplaced. *Arkwright* involved an "all-risk" property policy insuring against all risks of physical loss or damage to the insured's real and personal property. The Policy at issue here covers risk associated with certain conduct, such as "claims handling and adjusting." Therefore, *Arkwright* does not apply. Furthermore, the case at bar is not one involving the issue of a "moral hazard" created when an insurer breaches a contract then seeks coverage to effectively support the breaching of the contract. Here, Grange made a business decision to use the software in its claims handling and adjusting, and the application of the software to the insureds' claim process formed the basis of the lawsuits against Grange. This is the type of conduct that is expressly covered under the Policy.

Applying the plain and ordinary meaning of Insuring Clause 1, and the applicable definitions of pertinent terms, the Hensley and Gooding Actions constituted claims made against Grange "arising out of" a "wrongful act" committed by Grange "while performing insurance services." Therefore, there is coverage under Insuring Clause 1, provided that Grange incurred a "loss" as a result of the lawsuits against it, an issue which will now be resolved by the Court.

**B.    Coverage for "Loss" under Insuring Clause 1 of the Policy**

The Policy generally defines "loss" to mean the amount which Grange becomes legally obligated to pay as a result of a claim against Grange for **Wrongful Acts** for which coverage

17

applies, including, but not limited to, damages, judgments, settlements, costs and **Defense Costs**."
(Doc. 2-1, p. 18).  And the parties do not dispute that Grange became legally obligated to pay
certain amounts based on its settlement in the Gooding Action, and in defending itself in the
lawsuits.  However, Chubb argues that the settlement payments and defense costs did not
constitute a "loss" under the Policy, as the definition of "loss" excludes these payments and costs
under the facts of this case.  As noted by Chubb, "loss" does not include "matters or sanctions
which may be deemed uninsurable under the law pursuant to which this Policy shall be
interpreted[.]"  *Id.* at 19.  In this regard, Chubb asserts that the money that Grange saved from
using the software constituted "ill-gotten gains."  Based on this assertion, Chubb reasons that
Grange has not suffered a "loss" under the Policy because the disgorgement of the ill-gotten gains
is not insurable under the law.

In support of its position that the claim against Grange was uninsurable as a matter of law,
Chubb primarily cites *Level 3 Communications, Inc. v. Federal Ins. Co.*, 272 F.3d 908 (7th Cir.
2001).  The court in *Level 3 Communications* essentially determined that an uninsurable loss
includes repayment for an insured's retention of "ill-gotten" gains.  *See id.*  It opined that "a 'loss'
within the meaning of an insurance contract does not include the restoration of an ill-gotten gain. .
. An insured incurs no loss within the meaning of the insurance contract by being compelled to
return property that it had stolen, even if a more polite word than 'stolen' is used to characterize
the claim for the property's return."  *Id.* at 911.

Chubb's reliance on *Level 3 Communications* and other similar cases is misplaced.  *Level
3 Communications* applied a public policy exclusion for restitutionary relief from the definition of
loss in an insurance contract.  This exclusion only applies in limited circumstances, *i.e.* in

18

circumstances involving the insured being "required to restore to the plaintiff that which was wrongfully acquired." *See Unified W. Grocers, Inc. v. Twin City Fire Ins. Co.*, 457 F.3d 1106, 1115 (9th Cir. 2006) (quotation omitted). "The [insured] is asked to return something [it] wrongfully received; [it] is not asked to compensate the plaintiff for injury suffered as a result of his conduct." *Id.* Thus, "[t]he fundamental distinction is not whether the insured received 'some benefit' from a wrongful act, but whether the claim seeks to recover only the money or property that the insured wrongfully acquired." *Id.*

Here, although they requested restitutionary relief, the plaintiffs in the Hensley and Gooding Actions were in substance seeking damages for the alleged harm caused to them due to the allegedly wrongful conduct of Grange. Indeed, Grange allegedly received "some benefit" from using the software, in the form of retained money, but it did not "wrongfully acquire" this money – it simply retained it. Stated differently, the substance of the plaintiffs' claim in the Hensley and Gooding Actions was for damages, not restitution. Therefore, the provision excluding matters or sanctions "uninsurable under the law" from the definition of "loss" does not apply in this case.

### C. Application of "Benefits Due Exclusion" Provision of the Policy

Chubb argues that the "benefits due exclusion" precludes coverage in this case. Grange conversely argues that the claims against it were not for benefits due. This issue presents a close call. The Policy provides that there is no coverage for claims against Grange "for any amounts which constitute benefits, coverage or amounts due or allegedly due" from Grange "as . . . an insurer . . . under any policy . . . of insurance[.]" Thus, the amounts sought must be "due or allegedly due" for this exclusion to apply. And Black's Law Dictionary (9th Ed. 2009) defines

19

"due" in part as "owing or payable; constituting a debt."  Black's provides an example of this word's usage: "the tax refund is due from the IRS."  Black's further defines a "debt" in part as a "[l]iability on a claim; a specific sum of money due by agreement or otherwise[.]"

In this matter, Grange was acting as an insurer when it allegedly committed the wrongful act relating to its use of the software during the claims process.  The Hensley and Gooding plaintiffs alleged that Grange underpaid claims but did not allege amounts due.  The alleged underpayment related to general damages for bodily injury caused by uninsured or underinsured motorists.  Thus, these claimants had coverage for these damages, but the amount of these damages was not certain.  Grange asserts that it used the software so it would not overpay claims, and the plaintiffs alleged that Grange improperly used the software to underpay the claims.  Chubb seems to reason that because the plaintiffs in the Hensley and Gooding Actions alleged that they received less than they should have received, as a result of Grange using the software, they were seeking amounts due under their policies with Grange.  In support, Chubb relies heavily on *Georgia Farm Bureau Mut. Ins. Co. v. Great Am. & Surplus Excess Ins. Co.*, Case No. 5:03-CV-226, 2005 WL 1459649 (M.D. Ga. 2005), *affirmed by Georgia Farm Bureau Mut. Ins. Co. v. Great Am. Excess & Surplus Ins. Co.*, 152 F. App'x 883 (11th Cir. 2005).  The *Georgia Farm Bureau* case involved an insurance coverage dispute relating to an insured's settlement with third-party plaintiffs who claimed that the insured had wrongfully denied coverage for the diminished value of damaged vehicles after repair.  In *Georgia Farm Bureau*, the court determined that a benefits due exclusion, which was similar to the one found in the Policy, precluded coverage because this provision excluded coverage for the amount of benefits that would have been due under the policy.

The Court finds that *Georgia Farm Bureau* is distinguishable.  The essence of the wrongful conduct alleged in the Hensley and Gooding Actions was that Grange improperly used computer software in the handling of the plaintiffs' claims.  The plaintiffs were seeking damages in an undetermined amount for what they viewed as underpayment on claims due to allegedly improper action by Grange.  And the settlement reached in the Gooding Action only included class members who had previously settled their general damage bodily injury claims with Grange.  In this regard, there was no allegation in the Hensley or Gooding Actions that any amounts were due under the insureds' general damage bodily injury claim settlements with Grange.  The wrongful conduct of Grange that was alleged was not that it improperly denied coverage, it was that Grange improperly used computer software in the processing of claims, which allegedly ultimately resulted in the plaintiffs receiving less for general damages in bodily injury claims.  Thus, the facts of this case distinguish it from *Georgia Farm Bureau*.

Chubb essentially argues that, by using the software, Grange "saved" millions of dollars as it relates to the payment of general damages for bodily injury claims.  Chubb reasons that these "savings" resulted from the underpayment of benefits, and that the Stipulation of Settlement reflects this view.  The Stipulation of Settlement indicates that Grange and the settlement class, based on the defenses presented and the inherent risk to all from litigation, agreed to use "13% as a negotiated method to estimate Grange's average savings from use of [the software] on bodily injury claims during the class period."  Although this calculation on its face applies an estimation of Grange's "savings" from the use of the software, it is clear that it was used as a negotiated method to help reach a settlement between Grange and the settlement class.  In effect, the "savings" were used to estimate the settlement classes' damages.  Again, the Court notes that the

settlement class members had already settled their general damages bodily injury claims with Grange, and therefore no amounts were "due" or "allegedly due." In substance, the "negotiated method" provided a mechanism to calculate the "supplemental cash payments for general damages" to the settlement class resulting from Grange's allegedly improper use of the software.

In the final analysis, Chubb has not demonstrated that the plaintiffs in the Hensley and Gooding Actions were seeking "any amounts which constitute benefits, coverage or amounts due or allegedly due" from Grange as their insurer. That is, Chubb has not shown that it and Grange agreed to exclude such a claim from coverage under the Policy.

Therefore, the Court determines that Grange is entitled to coverage under the Policy for its losses in connection with the Hensley and Gooding lawsuits. These losses are covered under Insuring Clause 1, and no exception under the Policy applies. Thus, Grange is entitled to its requested summary judgment as to Counts I, II, and III of Chubb's Complaint, and Count II of its Counterclaim. Furthermore, because Grange is entitled to coverage under the Policy in relation to the Hensley and Gooding lawsuits, Chubb is not entitled to any reimbursement of fees and costs it advanced to Grange. Consequently, Grange is also entitled to partial summary judgment as to Count IV of Chubb's Complaint. Even in view of these determinations, there is still an unresolved dispute between the parties as to whether Grange is entitled to approximately $200,000 more from Chubb for fees and expenses. This dispute relates to Counts I and IV of Grange's Counterclaim. Grange does not seek summary judgment as to the defense costs issue, and it has indicated that it would consent to trying this issue to a Magistrate Judge of this Court.

**D. Bad Faith Counterclaim**

By Count III of its Counterclaim, Grange alleges a bad faith claim against Chubb.  Chubb moves for summary judgment as to this claim.  Chubb reasons that if this Court determines that there is no coverage under the Policy, then Grange's bad faith counterclaim should be dismissed as a matter of law.  However, because the Court has determined that there is coverage under the Policy, this argument obviously fails.  Grange does not move for summary judgment as to this counterclaim.  Nonetheless, the Court finds that additional briefing on this issue is appropriate.

In Ohio, an insurer has a duty to act in good faith toward its insured in carrying out its responsibilities under the policy of insurance.  *Hoskins v. Aetna Life Ins. Co.*, 452 N.E.2d 1315, paragraph one of the syllabus (Ohio 1983).  Those responsibilities include the handling and payment of an insured's claim.  *Id.*  As to whether an insurance company denied insurance coverage in bad faith, the crucial inquiry is whether "the decision to deny benefits was arbitrary or capricious, and there existed a reasonable justification for the denial," not whether the insurance company's decision to deny benefits was correct.  *Thomas v. Allstate Ins. Co.*, 974 F.2d 706, 711 (6th Cir. 1992) (citing Ohio law).

The case at bar presents genuinely debatable issues regarding insurance coverage.  Thus, Chubb's position that there is no coverage is not unreasonable.  And Chubb provided nearly $1.9 million to Grange for defense costs (albeit with a reservation of rights) during the underlying litigation, demonstrating its good faith.  Furthermore, despite having the opportunity in response to Chubb's Motion for Summary Judgment to specifically identify what it views as evidence of Chubb's bad faith conduct, Grange, in addition to citing the denial of its claim, simply alleges that Chubb engaged in "foot-dragging" on the claim.  The parties do not analyze whether the bad faith counterclaim can still be resolved by motions practice if the Court rules that there is coverage

under the policy.  While the nature of the insurance coverage dispute demonstrates an absence of bad faith by Chubb in denying coverage, Grange does not direct the Court to evidence demonstrating that Chubb otherwise acted in bad faith.  However, out of an abundance of caution, and because the parties' briefing on this issue centers on whether there may be bad faith in the absence of coverage, the Court requests additional briefing on the bad faith counterclaim. Therefore, the Court defers its ruling on Chubb's Motion for Summary Judgment as it relates to Grange's bad faith counterclaim, and instructs the parties to provide supplemental briefing on this issue.  Moreover, in order to potentially expedite the final resolution of this case, the Court also requests briefing on the issue of whether Grange is entitled to an additional reimbursement of approximately $200,000 for defense costs.  The parties' supplemental briefs shall be filed no later than December 16, 2011, with responses and replies to be filed pursuant to S.D. Ohio Civ. R. 7.2.

## VII.    CONCLUSION

For the foregoing reasons, the Court **DENIES in part** Chubb's Motion for Summary Judgment (Doc. 68), **GRANTS** Grange's Motion for Partial Summary Judgment (Doc. 69), and **DEFERS** ruling on Chubb's Motion for Summary Judgment as it relates to Grange's bad faith counterclaim.  Therefore, Grange's bad faith counterclaim, and the issue of whether Grange is entitled to approximately $200,000 more from Chubb for defense costs it incurred in the underlying lawsuits, remain pending.  To potentially expedite the final resolution of this case, the parties shall provide supplemental briefing on these issues.

The Clerk shall remove Documents 68 and 69 from the Court's pending motions list.

**IT IS SO ORDERED.**

_s/ George C. Smith_____
**GEORGE C. SMITH, JUDGE**
**UNITED STATES DISTRICT COURT**